**FIRST DIVISION
ELLINGTON, C. J.,
PHIPPS, P. J., and DILLARD, J.**

NOTICE: Motions for reconsideration must be
*physically received* in our clerk's office within ten
days of the date of decision to be deemed timely filed.
(Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008)
http://www.gaappeals.us/rules/

**December 18, 2012**

# In the Court of Appeals of Georgia

A12A1998. ROYAL v. THE STATE.

PHIPPS, Presiding Judge.

James Royal was convicted of committing against his girlfriend's niece, T. H., the offenses of: (i) child molestation, for kissing the child and touching her breast area; (ii) aggravated child molestation, for touching the child's vaginal area and thereby causing her physical injury; and (iii) first degree cruelty to children, for molesting said child and threatening to have the child placed in a foster home if she disclosed the sexual abuse he was inflicting upon her.[1] Royal challenges the

_____

[1] See OCGA §§ 16-5-70 (b) (providing that a person commits the offense of cruelty to children in the first degree when such person maliciously causes a child under the age of 18 cruel or excessive physical or mental pain); 16-6-4 (a) (1) (providing that a person commits child molestation when such person does any immoral or indecent act to or in the presence of or with any child under the age of 16 years with the intent to arouse or satisfy the sexual desires of either the child or the person); 16-6-4 (c) (providing that a person commits aggravated child molestation

sufficiency of the evidence and the admission of similar transaction evidence. We affirm.

At trial, the state showed the following. The incident underlying Royal's convictions occurred on May 13, 2008. Thirteen-year-old T. H., along with her minor sibling(s), were living with their aunt, Royal's girlfriend, because their mother had demonstrated irresponsible parenting and mental limitations. Their aunt shared a home with Royal, the couple's 11-year-old son, and their younger daughter.

On the evening of May 13, Royal was alone at the residence with the children, who had been instructed by Royal to clean their rooms. T. H. gave the following account. Royal called her to his and her aunt's bedroom and told her to sit on the bed; she obeyed. Royal shifted the child's clothing, then began kissing her neck and breast and rubbing her vaginal area. He warned T. H. that, if she told anyone about his acts, he would take her to a foster home. Royal's son suddenly entered the room tattling on another child, but Royal hurriedly ushered him out and sat back on the bed with T. H. While he was kissing the child's neck, T. H.'s aunt walked into the room, and Royal jumped to his feet. The aunt told T. H. to come with her, then drove the child

when such person commits an offense of child molestation which act physically injures the child).

2

away from the residence. The aunt asked T. H. whether Royal had hurt her; T. H. began crying and told her aunt what Royal had done.

Royal's son also testified about that evening. He had opened the bedroom door and walked in; the bedroom light was off, but he could see his father kneeling and T. H. sitting on the bed with a towel on her lap. His father told him to "get out," then shut the bedroom door as soon as the boy complied. Royal's son told his younger sister what he had seen; she went to the bedroom, but also was sent away by Royal, who again shut the bedroom door. After the boy's mother arrived and took T. H. away, Royal threatened to punish the boy if he told anyone what he had seen when he entered the bedroom. The police arrived later.

T. H.'s aunt gave her account. When she arrived home just after dark, at about 7:00, she walked to her and Royal's bedroom. The bedroom light was off, and she pushed opened the door. Royal was sitting beside T. H. on the bed; he was facing her and saying something to her. But when the door opened, Royal abruptly stood and began talking to the aunt about T. H.'s school matters. T. H. remained silent, looking afraid. After about three minutes, the aunt beckoned the child to come with her, and the two left the residence. Alone with her aunt, the child began crying and reluctantly disclosed that Royal had inappropriately touched her. The aunt grabbed her telephone

3

to summon police, but T. H. pleaded for her not to place the call, revealing that Royal had threatened that, if she told anyone about what he had done, she would get in trouble, he would get in trouble, the aunt would be angry, and she would be sent to a foster home. The aunt turned to go back to the residence, summoning police. When she arrived, Royal was outside and overheard her talking to dispatch personnel. Initially, Royal asked what he had done; next, he asked them not to report him to police; then he offered to leave the residence. Meanwhile, the police arrived.

One responding officer recalled that T. H. was sitting in her aunt's vehicle; the officer described that the child was curled into a fetal position and appeared shocked and hysterical; she was crying and would barely communicate with the officer. As the onsite investigation unfolded, Royal was arrested. A police investigator interviewed T. H. that same night. T. H. was crying and withdrawn, but eventually reported that Royal had kissed her on her lips and breast and put his finger in her private area. The investigator obtained a search warrant to obtain buccal swabs from Royal.

At about 11:00 a.m. on May 14, 2008, T. H. was seen by a sexual assault nurse examiner. T. H. told the nurse that Royal had licked her breast, put his mouth on her neck, and touched her inside her underwear. During a physical examination, to collect evidence, the nurse swabbed those areas which T. H. reported Royal had touched; and

4

the nurse detected on T. H.'s hymen an abrasion that was consistent with a friction-type mechanism or rubbing. About two weeks later, the nurse obtained DNA swab samples from Royal, which were turned over to law enforcement. However, at trial, the state did not present any DNA evidence linking Royal to T. H.

The state was allowed to introduce similar transaction evidence for the limited purposes, as the jury was instructed, of showing Royal's motive, intent, bent of mind, course of conduct and lustful disposition. The state elicited such evidence from two persons.

The first similar transaction witness was Royal's girlfriend (T. H.'s aunt) who recounted that, two or three times when she was about 11 or 12 years of age, Royal took her to an abandoned building, pulled down her pants, and placed his fingers and penis on her vaginal area. When she was 13 years old, Royal, who was then about 30 years old, began having sexual intercourse with her. During this time frame, her mother was dating either Royal or Royal's father,[2] and she and her own mother were living in the same residence as Royal (and others). By age 17, the girlfriend was pregnant with Royal's son.

---

[2] The record does not make this point clear.

Royal's girlfriend testified that Royal's response to her opening the bedroom door – he abruptly stopped talking to T. H., immediately stood up, then plunged into a three-minute dialogue with her about T. H.'s school matters – had made her fearful that he had begun sexually molesting her niece. She had sensed that "something wasn't right"; T. H. should not have been in that bedroom at that time of night; and the episode had reminded her of Royal's behavior during the period he was molesting her "[b]ecause if he was talking to me inappropriate[ly] and somebody came up, he would change the subject."

The second similar transaction witness was an older daughter of Royal, who was about 20 years old at the time of the underlying incident concerning T. H. The daughter recounted that when she was in the 8th grade and living with Royal (and T. H.'s aunt), Royal approached her in a bedroom, pulled down her clothing, and touched her vaginal area. The next day, Royal called her to a bed, told her to remove some of her clothing, then engaged in sexual intercourse with her. He threatened her that, if she told anyone, he would take her to a foster home.

Royal took the stand and denied the charges of the indictment, as well as the allegations of the similar transaction witnesses. According to Royal, he did not begin having sexual relations with his girlfriend until she was 17 years of age.

6

Regarding the evening in question, Royal recalled that his girlfriend was not at home. He had instructed the children to clean the residence; they had not complied, and he had repeatedly admonished them, particularly T. H. Meanwhile, T. H. went into his bedroom, sat on the bed, and began watching television. He sat beside T. H. and began discussing her school matters, while his younger daughter stood at the bedroom doorway. About this time, his girlfriend entered the house.

Royal testified that, although the bedroom light was off, the television was on. The bedroom door was never closed; he was never alone with T. H. because his younger daughter had remained in the doorway. After his girlfriend drove away with T. H., he began talking with his son about school matters. Royal denied telling his son and daughter to leave the bedroom, and he denied discussing with his son what he had seen inside the bedroom.

Royal testified that his older daughter had falsely accused him because she was still upset about dating restrictions he had imposed upon her when she lived with him. He claimed that his girlfriend had never forgiven him for not beating up his nephew after the nephew had physically fought her. Royal claimed that his girlfriend was upset with him also for having had little to no sexual desire since about 2006 and for thereafter having had health problems that diminished his sexual performance.

1. Royal challenges the sufficiency of the evidence. When an appellant challenges the sufficiency of the evidence to support the conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[3]

Royal cites his testimony denying that he had committed any act of sexual misconduct against T. H., his girlfriend, or his daughter. He asserts that he provided reasons why T. H., his girlfriend, and his daughter had falsely accused him. He claims that he explained at trial that, shortly before T. H. made the allegations to her aunt, he had sternly told T. H. to participate in the household cleaning and had further lectured the child on her schoolwork. Moreover, Royal points out that the state failed to introduce any DNA evidence connecting him to the charged offenses. According to Royal, the state's case contained weaknesses and was contradicted by his testimony, mandating a reversal of his judgment of conviction.

> But any evidentiary weaknesses, conflicts, or inconsistencies were for the jury to resolve. We do not speculate which evidence the jury chose to believe or disbelieve. Where as here, there was sufficient

---

[3] *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SC 2781, 61 LE2d 560) (1979).

8

evidence, even though contradicted, to support each fact necessary to make out the state's case, we must uphold the jury's verdict.[4]

2. Royal challenges the admission of the similar transaction evidence, making bare assertions that the test set forth in *Williams v. State*[5] was not met and that the prejudicial effect of the evidence outweighed its probative value.

> When reviewing the trial court's factual findings regarding whether the state satisfied the three-prong test mandated by *Williams*,[6] we apply the "clearly erroneous" standard. The decision to admit similar transaction evidence which satisfies the three-prong test is within the trial court's discretion and will not be disturbed absent an abuse of that discretion.[7]

---

[4] *Dix v. State*, 307 Ga. App. 684, 686 (1) (705 SE2d 903) (2011) (footnote omitted). See *Jackson*, supra; OCGA § 24-4-8 (providing that the testimony of a single witness is generally sufficient to establish a fact); *Williamson v. State*, 315 Ga. App. 421, 423-424 (1) (a) (727 SE2d 211) (2012); *Adorno v. State*, 314 Ga. App. 509, 511-512 (1) (724 SE2d 816) (2012).

[5] 261 Ga. 640, 641 (2) (b) (409 SE2d 649) (1991) (outlining the three-prong test for determining whether evidence of an independent act may be admissible as similar transaction evidence).

[6] Supra.

[7] *Reed v. State*, 291 Ga. 10, 14 (3) (727 SE2d 112) (2012) (citations omitted).

Having reviewed the record, we find no merit in Royal's challenge to the admission of the similar transaction evidence.[8]

*Judgment affirmed. Ellington, C. J., and Dillard, J., concur.*

---

[8] See *Hunt v. State*, 288 Ga. 794, 797-798 (3) (708 SE2d 357) (2011) (in determining the admissibility of similar transaction, focus is properly on similarities, and not differences, between act in question and incident on trial; if the admitted purpose of similar transaction evidence is to show bent of mind or course of conduct, a lesser degree of similarity is required than when such evidence is introduced to prove identity); *Pareja v. State*, 286 Ga. 117, 119-121 (686 SE2d 232) (2009) (noting that the three-part test presents "the mechanism by which one can determine whether the probative value of the similar transaction evidence outweighs its prejudicial impact upon the defendant," and the outcome of the balancing test generally determines the admissibility of the similar transaction evidence; explaining further that the principle – when considering the admissibility of similar transaction evidence, the proper focus is on the similarities, not the differences – "is most liberally extended in cases involving sexual offenses because such evidence tends to establish that a defendant has such bent of mind as to initiate or continue a sexual encounter without a person's consent"); *Bibb v. State*, 315 Ga. App. 49, 51-52 (2) (a, b) (726 SE2d 534) (2012).