**FIRST DIVISION**
**PHIPPS, C. J.,**
**ELLINGTON, P. J., and BRANCH, J.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**September 5, 2013**

# In the Court of Appeals of Georgia

A13A1178. MORAST v. THE STATE.

PHIPPS, Chief Judge.

Margaret Morast was indicted on two counts of cruelty to children in the first degree in connection with offenses committed against her daughter;[1] she was found guilty of two counts of cruelty to children in the second degree as lesser included offenses.[2] Morast appeals, challenging the sufficiency of the evidence to support the convictions. We affirm.

A person commits the offense of cruelty to children in the second degree "when such person with criminal negligence causes a child under the age of 18 cruel or

---

[1] OCGA § 16-5-70 (b).

[2] OCGA §§ 16-5-70 (c), 16-1-6.

excessive physical or mental pain."[3] "Criminal negligence is an act or failure to act which demonstrates a willful, wanton, or reckless disregard for the safety of others who might reasonably be expected to be injured thereby."[4]

Count 1 of the indictment alleged that Morast committed the offense of cruelty to children (first degree) in that she, between December 20, 2007 and March 7, 2009, unlawfully and maliciously caused her daughter cruel and excessive physical pain by causing multiple fractures to the child's bones. Count 2 alleged that Morast committed the offense of cruelty to children (first degree) in that she, between March 1, 2009 and March 7, 2009, unlawfully and maliciously caused the child cruel and excessive physical pain by failing to seek medical care for her after the child was bitten by a dog, bitten by a human, and suffered excessive vomiting.[5]

When an appellant challenges the sufficiency of the evidence to support the conviction, the relevant question for this court, after viewing the evidence in the light

---

[3] OCGA § 16-5-70 (c).

[4] OCGA § 16-2-1 (b).

[5] The child's father, Scott Watson, was also charged in the indictment with the same offenses. Watson died before Morast's trial.

most favorable to the prosecution, is whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[6]

So viewed, the evidence showed the following. The child's maternal grandmother testified that the child had lived with Morast, Watson, and Watson's father since the child's birth in December 2007. On Friday, March 6, 2009, the grandmother was scheduled to pick up the child, who was then15 months old, from the child's home for a weekend visit; the grandmother had been picking up the child for weekend visits since the child was two or three months old. Morast cancelled the scheduled pick-up. When the grandmother went to pick up the child on the following day, Morast informed her that the child had been vomiting for several days. The child was unable to keep down fluids, and her skin was clammy. To the grandmother's knowledge, no one had sought medical care for the child. The grandmother also noticed that the child had a bruise on her forehead and what appeared to be a human bite mark on her leg; and at some point that month, the grandmother noticed that the child's wrist was swollen and that the child was "favoring" one of the wrists. The grandmother took the child to a hospital emergency room for treatment.

---

[6] *Royal v. State*, 319 Ga. App. 466, 470 (1) (735 SE2d 793) (2012) (footnote and punctuation omitted), citing *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

3

The grandmother testified that she had observed bruising to the child's body "[p]retty much" throughout the child's life, and that she had observed bruising nearly every time she picked up the child. When the grandmother had asked Morast about the bruising, Morast told her that the child fell down a lot. Morast had also told the grandmother that when she (Morast) arrived home from work, she would check the child's body for new bruising, after the child's father had been caring for the child. The grandmother affirmed that Morast had told her that "she [Morast] was afraid DFCS might get involved if [the child's] injuries were reported to the police."

A registered nurse testified that she was working in the hospital emergency room on March 7, 2009, when the grandmother brought the child in for treatment. The child was listless and had bruises on her arms and legs. The nurse affirmed that the child had been treated at the hospital for a fractured arm in February 2008, when the child was two months old.

A medical doctor testified that he examined the child after she was admitted to the hospital in March 2009. The doctor, who was qualified as a medical expert in the area of child abuse, observed numerous bruises on the child, including on her scalp, forehead and ear, and clusters of bruises on her back and torso. The child had a

4

human bite mark on her leg, and what the doctor "couldn't entirely rule out" as dog bite marks on her head.

The doctor testified that bone scans and x-rays revealed at least five bone fractures, which fractures were in various stages of healing, including: two new fractures of bones in the child's forearm (the ulna and radius, commonly known as the wrist); fractures of both of the child's shoulder blades, which fractures had begun to heal; and a fracture of a bone in the upper arm (the humerus), which was in the healing stage and was not the same fracture as the one the child had sustained at the age of two months (that previous fracture had completely healed). The doctor opined that the shoulder blade fractures would have resulted from a "major force" or "major impact," rather than a "simple fall on the hands," that the fractures would have caused pain to the child in the area of the injury, and that manipulation of the arm after the injury would have been painful; the doctor had not received any information that the shoulder blade fractures had been treated and, to his knowledge, they had not. There had been swelling and bruising at the site of the wrist fracture. The fracture to the humerus was "one of those fractures that is highly specific for abuse," would have been very painful to the child at the time of the injury, and probably would have caused pain for a few days thereafter. The doctor testified that the bruising on the

5

child's back and torso was unusual for accidental trauma, especially in a small child; the fractures to the shoulder blades were also unusual and, when observed in young children, "they're almost always related to abuse." The doctor opined that most, if not all, of the injuries were related to physical abuse, and that the child had suffered pain as a result of the injuries.

A babysitter testified that she had cared for the child in Morast's home in about February 2009 for about two to three hours per day, one to three times per week, while Morast and Watson were at work. Each time she babysat the child, she observed new bruises; the bruises were on the child's torso, arms and legs. When the babysitter noticed bruises on the child, she brought them to Morast's attention. It appeared that Morast already knew about some of the bruises, and explained that the family dogs (which included two pit bulldogs and a beagle) had caused them.

During the week leading up to March 7, 2009, the babysitter observed that the child appeared to be sick, was vomiting, would not eat, and had bruises on her arms, legs, and back, and "all over" her spine; some of the bruises were "older," and some were "fresh." The child also had a gash on her head, and what appeared to be bite marks on her head and leg.

6

A police detective testified that in March 2009, he saw the child at the hospital and observed bruising on her back, shoulder, arm, and knee, and what appeared to be a human bite mark on her leg and animal bite marks on her head.

Morast testified on her own behalf, stating that she, Watson, and her mother had provided the "day-to-day" care for the child since the child's birth, and that Morast had never physically abused or seen anyone else physically abuse her child. Morast acknowledged, however, that in the week before her child was taken to the hospital, she knew that her child had been bitten by a dog days earlier, had been bitten by a human, and had vomited continuously; that on more than one occasion, one of the family dogs had become annoyed by the child and had growled at and bitten the child; that the 2008 arm fracture had resulted from one of the dogs jumping on the child's arm; that Morast had told a detective in March 2009 that the child "always has bruises"; and that the babysitter and maternal grandmother had brought to Morast's attention the child's bruises, but that Morast had never sought medical attention for any of the injuries. When asked if she had told her mother (the grandmother) that every day upon coming home from work she checked the child for new injuries, Morast replied, "No, not every day." Morast had told the detective that the bite marks "could have been 'play' bites" inflicted by Watson or the dogs. Morast affirmed that,

despite the injuries, she continued to leave the child alone with Watson every day when she went to work. Prior to the 2009 hospital visit, no one (including Morast) had told the grandmother about the child's bone fractures.

Morast does not contend that the child was not abused, but asserts that the evidence did not show that *she* had inflicted the child's injuries or had been present when the injuries were inflicted. She argues that she was but one of four people with care-giving responsibility for the child, and that one of the other persons might have inflicted the injuries. The evidence was sufficient to support the convictions.

As set out above, Count 1 pertinently charged Morast with cruelty to children (first degree) for allegedly causing multiple fractures to the child's bones; Morast was convicted of cruelty to children in the second degree as a lesser included offense of that charge.[7] Although the evidence did not show that Morast had personally caused the bone fractures, the evidence, some of it circumstantial, authorized findings that multiple bone fractures were being inflicted upon the young child over the course of about 13 months, that the bone fractures had caused the child manifest physical pain,

---

[7] OCGA § 16-1-6 (1) pertinently provides that an accused may be convicted of a crime included in a crime charged in the indictment or accusation, and that a crime is so included when it is established by proof of the same or less than all the facts or a less culpable mental state than is required to establish the commission of the crime charged.

that Morast was aware that the bone fractures were being inflicted while the child was in her and/or Watson's care,[8] and that Morast had failed to intervene to prevent the injuries from recurring–thereby demonstrating a willful, wanton, or reckless disregard for the child's safety.[9]

---

[8] As examples, Morast testified that one of the dogs had jumped on the infant and broken her arm; the grandmother had noticed that the child was favoring one wrist and that one wrist was swollen; the doctor testified that the bone fractures would have been painful; Morast had not ever disclosed to the child's grandmother that the child had sustained any bone fractures (including the bone fracture Morast admittedly knew about); and Morast had said she did not want the child's injuries reported to authorities.

[9] See OCGA § § 16-1-6, 16-2-1 (b), 16-5-70 (c); see generally *Adorno v. State*, 314 Ga. App. 509 (724 SE2d 816) (2012) (evidence was sufficient to support conviction for child cruelty in the first degree when there was evidence that the victims had told the defendant that the defendant's boyfriend was molesting them, but the defendant failed to intervene, did not contact police, and tried to dissuade the victims from revealing the boyfriend's actions); *Wells v. State*, 309 Ga. App. 661, 664 (2) (b) (710 SE2d 860) (2011) (evidence of cruelty to children in the second degree as a lesser included offense was sufficient to support conviction where the defendant had caused burns to the child, even if accidentally); *Hinds v. State*, 296 Ga. App. 80, 81 (1) (a) (673 SE2d 598) (2009) (evidence was sufficient to support conviction for child cruelty in the first degree when evidence showed either that the defendant was a party to the crimes committed upon the child by her boyfriend or that the defendant had caused the injuries to the child, which injuries were significant and had occurred over a period of time while the child was in the defendant's care, and that the defendant had tried to conceal the injuries from the authorities); *Thompson v. State*, 262 Ga. App. 17, 18-19 (1) (585 SE2d 125) (2003) (evidence, though circumstantial, was sufficient to sustain defendants' convictions for cruelty to children where there was evidence that the child had suffered scratches, bruises and multiple bone fractures while in the care of the defendants, that they had refused to seek prompt

As set out above, Count 2 pertinently charged Morast with failing to seek medical care for the child after the child was bitten by a dog and a human, and suffered excessive vomiting. "[T]he failure to seek timely medical care for a child may form the basis for the offense of cruelty to children."[10] Here, Morast knew for several days that the child was suffering from dog and human bites and excessive vomiting, but did not seek medical attention for the child. The evidence, as set forth above, authorized a finding that Morast was criminally negligent by failing to seek medical care for the child.[11]

*Judgment affirmed. Ellington, P. J., and Branch, J., concur.*

---

medical treatment, and that they were evasive in explaining the injuries).

[10] *Grayer v. State*, 282 Ga. 224, 225 (1) (647 SE2d 264) (2007) (citation omitted).

[11] See generally OCGA § § 16-1-6, 16-2-1 (b), 16-5-70 (c); *Mikenney v. State*, 277 Ga. 64, 66 (2) (586 SE2d 328) (2003) (evidence was sufficient to support the conviction for child cruelty as the predicate act underlying a felony murder count, when it showed that the infant had suffered blunt force trauma to the abdomen, and the defendant had told the child's mother not to seek medical treatment for the child because authorities would see the bruises and take the child away); *Wells*, supra; *Thompson*, supra.