**FIRST DIVISION**
**BARNES, P. J.,**
**MCMILLIAN and REESE, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**June 29, 2018**

# In the Court of Appeals of Georgia

A18A0184. EVANS v. THE STATE.

McMILLIAN, Judge.

Stephanie Evans appeals from the denial of her motion for new trial after a jury convicted her of one count of involuntary manslaughter[1] in connection with the death of Rodney Graham ("RG"),[2] an inmate who died while incarcerated at the jail run by the Douglas County Sheriff's Office. Evans asserts on appeal that the evidence was insufficient to support her conviction. Although we find that the evidence was sufficient to support a jury finding that Evans' actions and inactions constituted reckless conduct, the alleged crime underlying the charge of involuntary

---

[1] The jury acquitted Evans of a separate charge of involuntary manslaughter in connection with RG's death.

[2] To avoid confusion, we refer to Rodney Graham as "RG," to his family members by their first names, and to Dr. Jimmy Graham as "Dr. Graham."

manslaughter, we find that the State failed to present evidence sufficient for the jury to find beyond a reasonable doubt that Evans' reckless conduct caused RG's death. Accordingly, we reverse.

1. When this Court considers the legal sufficiency of the evidence to support a criminal conviction, "we must view the evidence in the light most favorable to the verdict, and we inquire only whether any rational trier of fact might find beyond a reasonable doubt from that evidence that the defendant is guilty of the crimes of which he was convicted." (Citation omitted.) *Walker v. State*, 296 Ga. 161, 163 (1) (766 SE2d 28) (2014). See also *Jackson v. Virginia*, 443 U.S. 307 (99 SCt 2781, 61 LE2d 560) (1979). Under this review, "we put aside any questions about conflicting evidence, the credibility of witnesses, or the weight of the evidence, leaving the resolution of such things to the discretion of the trier of fact." *White v. State*, 293 Ga. 523, 523 (1) (753 SE2d 115) (2013). Rather, "in every case the jury is the arbiter of credibility including as to the defendant's explanation, and the jury is the body which resolves conflicting evidence, and where the jury has done so, the appellate court cannot merely substitute its judgment for that of the jury." (Citation omitted.) *Lowery v. State*, 264 Ga. App. 655, 658 (3) (592 SE2d 102) (2003). Nevertheless, "it is axiomatic that the evidentiary burden in a criminal prosecution is upon the State to

prove every material allegation of the indictment and every essential element of the crime charged beyond a reasonable doubt." (Citation and punctuation omitted.) *Jones v. State*, 272 Ga. 900, 902 (2) (537 SE2d 80) (2000). And when the State fails to carry this burden, the defendant is entitled to a reversal of his or her conviction. See, e.g., *Chestnut v. State*, 331 Ga. App. 69, 77 (769 SE2d 779) (2015); *Futch v. State*, 316 Ga. App. 376, 380 (1) (a) (730 SE2d 14) (2012); *Brown v. State*, 152 Ga. App. 273, 274 (1) (262 SE2d 497) (1979).

So viewed, the evidence showed that at the time of RG's incarceration at the jail, Evans was serving as the supervisor for the medical department for the Douglas County Sheriff's Office. The department's three other employees were Chad Skinner, Kelli Brown, both EMTs, and Jody Faircloth, a medical assistant, and all four employees worked at the Douglas County jail. Dr. Jimmy Graham contracted as the medical director for the sheriff's office, which meant he made limited, regular visits to the jail but was on-call for all medical issues. RG was admitted to the jail for a probation violation on Wednesday, October 28, 2009, and the following Sunday, November 1, he submitted a form requesting medical assistance, stating that he was vomiting, could not keep anything down, and was "really weak." Faircloth, who was on call that day, visited RG in his cell, and he told her of his symptoms and also that

he had a history of kidney stones and infections. Faircloth gave RG medication to treat his symptoms. At around 10 p.m. that night, RG called his wife, Cathy Graham, to tell her that he thought he was getting a kidney infection and was concerned that he was not going to get adequate care at the jail.

The next morning, Monday, November 2, Faircloth reported the situation involving RG to Evans, and they arranged for him to come to the medical department for a follow-up. After a urinalysis revealed blood, leukocytes, and bilirubin in RG's urine, which Evans and Faircloth believed to be indications of an infection, they continued treating RG for nausea and pain and added an antibiotic to treat the infection and Gatorade for hydration. Faircloth and Evans also performed a drug test, which reflected the presence of several illegal drugs in RG's urine. In the meantime, Cathy had obtained a note from Dr. Vance Boddy, RG's physician and delivered it to the jail. The note stated that RG had a severe kidney problem and impaired renal function, which caused him to pass multiple kidney stones weekly and required "frequent narcotic administration and medical oversight[.]" Evans acknowledged receiving this note and calling Dr. Boddy's Office for further clarification. During that call, she learned that Dr. Boddy had prescribed Percocet, a narcotic, to treat RG's condition, and she knew that she was unable to administer narcotics at the jail. Evans

4

made the decision to initiate the protocol for detox by giving RG additional medication and placing him in an isolation room at around 11 a.m. with a camera to monitor him.

Cathy had also communicated RG's concerns to his parents overnight, and his father Ray Graham called the jail Monday morning and spoke to a woman he believed was Evans. Ray told her that RG had serious kidney problems and asked that he receive appropriate help. The woman replied that they knew what was wrong with RG – he was detoxing – and they did not need any help or any medical records. Concerned about this response, Ray sent an e-mail to the division commander overseeing the Douglas County jail, explaining that RG had "a very bad kidney problem" that caused him to pass kidney stones weekly and resulted in frequent, severe kidney infections, requiring hospitalizations due to his kidneys shutting down. Ray stated that he was concerned that RG's kidneys were in danger of shutting down again, which could endanger his life or his long-term health.[3] Evans admitted that she received and read Ray's e-mail, and after discussing the issues raised in the e-mail and Dr. Boddy's note with Faircloth, she asked for a release from RG to obtain his

---

[3] When Ray received no response to his e-mail, he called the jail again and spoke with Evans, who told him that he could not talk with RG because he was in isolation.

medical records from one of the local emergency rooms ("ER"). Evans reviewed these records, which showed that RG had visited the hospital ER on a number of occasions for kidney stones, infections, and renal failure, which sometimes required hospitalization.

The next day, Tuesday, November 3, between 8:05 and 9:00 a.m., Evans visited RG in his isolation cell to give him medicine for nausea, which was the only time she ever visited RG's cell and the last time she had personal contact with him. Thereafter, she relied on Brown and Skinner, as well as other non-medical jail employees, to monitor RG's condition; however, the evidence supported that Evans never told any of them that RG suffered from a recurring kidney condition, involving weekly kidney stones and serious infections. Instead, they were told only that RG was detoxing. At around 12:30 that day, Joan Graham, RG's mother called the sheriff's office to discuss his condition and to offer to bring RG's medical records from two hospitals where he had received treatment. However, she was told that the records were not needed; rather, she was told that RG was detoxing. That evening after Deputy Tina Shepherd arrived for her 6:00 p.m. to 6:00 a.m. shift, she noticed that RG was "really weak" and that he had been vomiting and could not keep anything down. Two deputies were required to take him to the shower that night because he was so weak.

6

Before Deputy Shepherd left the next day, Wednesday, November 4, at around 6:00 a.m., she spoke with Brown about RG's condition, telling her he was "really sick," weak, and could not keep anything down. About an hour later, during the inmate headcount, Deputy Robert Glynn Gale found RG lying face down on the floor, shaking and moaning. Brown was summoned to the cell to check on RG. When Brown took his vital signs, she could not get a blood pressure reading, his oxygen level was extremely low, and his pulse was elevated. Brown testified that based on these observations, she believed RG had experienced a seizure. Deputy Gale testified that he told Brown at the time that he thought RG needed to go to the hospital, but Brown told him that RG was detoxing and did not need to go to the hospital. When Evans arrived for her shift at around 8:00 a.m., Brown told her that she thought RG "had had a seizure, that his boxers were wet, that he was laying face down, on the floor, when [she] first saw him, and that he was slow to arouse," but she reported that he later appeared to have come out of the seizure and become alert and oriented. At around 1:00 to 2:00 p.m., a deputy found RG lying under his bunk and shaking. He notified the medical department, and Evans sent Skinner to check on RG. Skinner found RG lying on the floor of his cell, but he did not take RG's vital signs because he was in a rush to perform other tasks. However, he asked RG if he wanted to get in

his bunk, and RG said "no." Skinner reported these circumstances to Evans. Deputy Gale stated that he continued to check on RG throughout his shift that day and he could see RG lying on his back, on the floor of his cell, with his hands in the air, shaking. Gale testified that on four occasions, he asked Evans and/or Brown to check on him. Although he continued to urge Brown and Evans that RG needed to go to a hospital, they continued to respond that RG was detoxing. After Shepherd returned for her shift that evening at around 6:00 p.m., during the inmate head count, she discovered, RG lying on the floor with his hands in the air, unresponsive, with his eyes wide open, and not moving. Another deputy and Skinner began CPR, but after RG was transported to the hospital, he was pronounced dead.

Evans was convicted of involuntary manslaughter under OCGA § 16-5-3 (a) "in that the defendant did cause the death of Rodney Graham, without any intention to do so, by the commission of an unlawful act other than a felony, to wit: Reckless Conduct, O.C.G.A. § 16-5-60 (b)[.]" More specifically, Count Two of the indictment alleged that Evans failed to provide RG proper medical care and treatment

> in that inmate Rodney Graham was suffering from a life threatening
> kidney disorder while incarcerated at the Douglas County jail and
> despite repeated requests from family members of Rodney Graham the
> defendant failed to properly treat and care for Rodney Graham and

8

further, notwithstanding these repeated requests to provide the necessary treatment the defendant failed to do so resulting in his death, contrary to the laws of said State, the good order, peace and dignity thereof.

Under OCGA § 16-5-60 (b), the reckless conduct statute,

[a] person who causes bodily harm to or endangers the bodily safety of another person by consciously disregarding a substantial and unjustifiable risk that his act or omission will cause harm or endanger the safety of the other person and the disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation is guilty of a misdemeanor.

As the trial court charged the jury, "the crime of reckless conduct is, in essence, an instance of criminal negligence[,] rather than an intentional act[,] which causes bodily harm to or endangers the bodily safety of another." See also *Riley v. State*, 250 Ga. App. 427, 429 (2) (551 SE2d 833) (2001). And criminal negligence is statutorily defined as "an act or failure to act which demonstrates a willful, wanton, or reckless disregard for the safety of others who might reasonably be expected to be injured thereby." OCGA § 16-2-1 (b).

We find that the evidence at trial was sufficient to support a finding by the jury that Evans failed to provide proper medical care and treatment for RG's kidney disorder and that her failure to do so was in reckless disregard of his safety. Evans

9

had information from multiple sources that RG's kidney condition was severe, required close medical supervision, and had, in fact, resulted in multiple hospitalizations. Nevertheless, she did not inform Dr. Graham of RG's condition before scheduling an appointment for the doctor to see RG on November 5, four days after RG first began exhibiting similar symptoms as noted in the hospital medical records. Instead, Evans focused her treatment on detoxing him from his prescribed narcotics and/or illegal drugs despite warnings from RG's doctor and family and evidence in the medical records showing that his disorder had previously resulted in renal failure. Moreover, Evans failed to inform Brown and Skinner or other jail employees, upon whom she relied to evaluate RG's condition, that he suffered from a severe and apparently recurring kidney disorder, thereby preventing them from considering that factor during their evaluation of his symptoms of vomiting, seizure, and extreme weakness.

This evidence supported a jury finding that Evans disregarded a substantial and unjustifiable risk that her acts or omissions would cause harm or endanger RG's safety, and that her disregard constituted a gross deviation from the standard of care which a reasonable person in her position would exercise. Likewise, the jury was authorized to find that her actions and inactions demonstrated a willful, wanton, or

10

reckless disregard for RG's safety so as to amount to criminal negligence. See *Morast v. State*, 323 Ga. App. 808, 813 (748 SE2d 287) (2013) (failure to seek medical care for child who had been bitten multiple times and was suffering from excessive vomiting sufficient to support finding of criminal negligence). Accordingly, applying the proper standard of review, the evidence was sufficient for the jury to find that Evans was guilty of reckless conduct, the underlying unlawful act to the involuntary manslaughter charge. See generally *Patterson v. State*, 269 Ga. App. 328, 33031 (604 SE2d 569) (2004) (upholding jury verdict finding reckless conduct); *Cowan v. State*, 218 Ga. App. 422, 422 (461 SE2d 587) (1995) (same); *Cross v. State*, 199 Ga. App. 266, 267 (1) (404 SE2d 633) (1991) (same criminal negligence).

Nevertheless, to support Evans' conviction for involuntary manslaughter, the State was also required to present evidence showing that Evans' reckless conduct caused RG's death within the meaning of OCGA § 16-5-3 (a). For charges of involuntary manslaughter in Georgia, proof of cause requires proof of proximate cause. See *State v. Jackson*, 287 Ga. 646, 651 (2) n.4 (697 SE2d 757) (2010). Our Supreme Court has determined that "[i]n a criminal case, proximate cause exists when the accused's act or omission played a substantial part in bringing about or actually causing the victim's injury or damage and the injury or damage was either a direct

11

result or a reasonably probable consequence of the act or omission." (Citation and punctuation omitted.) *Skaggs v. State*, 278 Ga. 19, 19-20 (596 SE2d 159) (2004).

The State's evidence of causation was presented through the testimony of the medical examiner, who opined that RG "died of complications of chronic renal failure with electrolyte abnormality and nephrolithiasm," which another doctor defined as having "[a] lot of kidney stones."[4] The medical examiner explained that chronic renal failure occurs over a prolonged time, weeks, months, or years. Although she testified that had RG seen a doctor earlier, he or she could have intervened to correct the electrolyte abnormality, she stated that there was no assurance that RG would not have gone into renal failure even with such treatment. Rather, in response to a question about whether RG would have survived if he had been treated four hours before he was found non-responsive, the medical examiner testified that although there would have been the opportunity to treat RG, she could not "make that assessment that, in fact, the patient will have been cured or will have been treated accordingly." And even though the medical examiner acknowledged that getting RG

---

[4] Although the State also presented the testimony of Dr. Boddy and the emergency room doctor who declared RG's death, they were not presented as expert witnesses, but instead testified as fact witnesses, as did Dr. Graham; their testimony did not address the cause of RG's death.

12

treatment earlier would have "helped," she testified that "[n]obody knows to what extent this therapy would have helped him survive."

Likewise, the medical examiner's affirmative response to the question on cross-examination asking, "[I]f someone had seen blood in his urine 48 hours to 60 hours earlier, would there have been the possibility that treatment could have, at least, prolonged this life?" was insufficient for the jury to find that Evans' actions or omissions proximately caused RG's death. Although this testimony raises a possibility of some treatment that could have prolonged RG's life, the medical examiner did not identify what blood in the urine indicated nor did she specify the "treatment" that could have possibly prolonged life in response to the presence of blood in the urine. And in fact the evidence showed that Faircloth and Evans did respond to the presence of blood, leukocytes, and bilirubin in RG's urine by prescribing an antibiotic to combat any infection. The medical examiner testified that at the time of RG's death, he did not have an infection nor was his death caused by an infection. Therefore, while the evidence raises a possibility that some unidentified treatment could have prolonged RG's life, it also raises the possibility that the treatment Evans provided RG was effective in treating any infection.

We find, therefore, that the State's evidence falls short of establishing beyond a reasonable doubt that Evans' reckless conduct was the proximate cause of RG's death. The prosecution failed to present evidence establishing that Evans' reckless conduct played a substantial part in bringing about or actually causing his death, and it failed to demonstrate that RG's death was a direct or reasonably probable consequence of Evans' actions or inactions. At best, the State's medical evidence only supported the *possibility* that earlier more aggressive medical intervention *might* have extended RG's life.

Because the State failed to carry its burden to establish that Evans was guilty of involuntary manslaughter beyond a reasonable doubt, her conviction must be reversed. See *Brown*, 152 Ga. App. at 274 (1) (State's "failure to produce evidence connecting [victim's] death with the alleged unlawful acts of the defendants mandates reversal"). Compare *Lewis v. State*, 180 Ga. App. 369, 372 (5) (349 SE2d 257) (1986) (upholding conviction for involuntary manslaughter based on abuse of premature child where medical examiner expressly testified that the cause of death was pneumonia associated with malnutrition and child abuse); *Early v. State*, 170 Ga. App. 158, 163-64 (6) (316 SE2d 527) (1984) (upholding conviction for involuntary manslaughter even where evidence showed that victim's lupus contributed to her fatal

14

kidney infection where medical experts were unequivocal that the physical injuries defendant inflicted on victim and the resulting infection, along with prolonged neglect, directly and materially contributed to her death).

2. Because we have found that the evidence was insufficient to support Evans' conviction, we need not address the other enumerations of error she asserted on appeal.

*Judgment reversed. Barnes, P. J., concurs. Reese, J., concurs in judgment only.*\*

**\*THIS OPINION IS PHYSICAL PRECEDENT ONLY. COURT OF APPEALS RULE 33.2 (a).**